IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | :: | |
| | :: | CRIMINAL ACTION NO. |
| v. | :: | |
| | :: | 1:17-CR-342-ELR-AJB |
| PAULINE MEDIKO BADIKI, | :: | |
| FERDINAND MEDIKO, and | :: | |
| MONICA MEDIKO, | :: | |
| | :: | |
| Defendants. | :: | |

UNITED STATES MAGISTRATE JUDGE'S ORDER
AND FINAL REPORT AND RECOMMENDATION

Pending before the Court are the following pretrial motions filed by Defendants

Pauline Mediko Badiki ("Pauline"), Ferdinand Mediko ("Fred"), and Monica Mediko

("Monica"): (1) a motion to sever, [Doc. 31]; (2) a motion for a *Jackson-Denno* hearing

and to suppress statements, [Doc. 32]; (3) a motion to suppress evidence seized by

search warrants, [Doc. 34]; and (4) a motion to suppress evidence seized pursuant to

a search for emails and electronically stored information, [Doc. 38].  The Court held an

evidentiary hearing as to Monica's statements, [Doc. 40 (hereinafter "T__")], because

only Monica made statements that the Government intends to introduce at trial.  For the

following reasons, the Court **RECOMMENDS** that the motions to suppress be

**DENIED** and the motion to sever be **DENIED IN PART AND DEFERRED IN**

**PART** to the District Judge.

## I.   *Introduction*

Defendants are charged in a 37-count indictment with: (1) wire fraud conspiracy, in violation of 18 U.S.C. §§ 1343 & 1349 (Count 1); (2) wire fraud, in violation of 18 U.S.C. §§ 2 & 1343 (Counts 2-13); (3) theft of government funds, in violation of 18 U.S.C. §§ 2 & 641 (Counts 14-25); and (4) Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC") fraud, in violation of 18 U.S.C. § 2 & 42 U.S.C. § 1760(g) (Counts 26-37). [Doc. 1 at 1-10]. The indictment also contains a forfeiture provision. [*Id.* at 10-11].

## II.   *Motion to Suppress Statements, [Doc. 32]*

The Court held a *Jackson-Denno*[1] hearing on the motion to suppress, after which the parties filed post-hearing briefs. [Docs. 41, 42, 43, 44]. With briefing completed

---

[1]   A "defendant has a constitutional right to a fair hearing and an independent and reliable determination of the voluntariness of a confession before the confession is allowed to be heard by the guilt determining jury." *United States v. Davidson*, 768 F.2d 1266, 1269-70 (11th Cir. 1985) (citing *Jackson v. Denno*, 378 U.S. 368, 376-77 (1964)) (footnote omitted). "Such a *Jackson v. Denno* hearing is constitutionally mandated for a defendant who timely urges that his confession is inadmissible because not voluntarily given." *Id.* at 1270 (citing *Smith v. Estelle*, 527 F.2d 430, 431 n.3 (5th Cir. 1976)). "The voluntariness hearing must afford the defendant an opportunity to testify regarding the inculpatory statement out of the jury's presence without prejudice to his right not to take the stand in his defense." *Id.* (citation omitted)

AO 72A
(Rev.8/8
2)

on the motion to suppress statements, the undersigned turns to its merits.

**A.      Facts**

This motion revolves around statements Monica made during the execution of a federal search warrant at her place of business.  On June 11, 2013, at approximately 9:30 a.m., United States Department of Agriculture ("USDA") Office of Inspector General Investigations ("OIG") Special Agents Frederick McCree ("McCree") and Douglas Bridges ("Bridges"), four other USDA-OIG agents, and an Atlanta Police Department ("APD") officer executed a search warrant at Poly-Plex Pharmacy, Inc. ("Poly-Plex") located in Atlanta, Georgia.  T2, 4-5, 18-20.[2]  Monica was a pharmacy

_____

[2]      The agents suspected Defendants, the owners/operators/relevant employees of Poly-Plex, of being criminally connected to a WIC fraud investigation. T3-5.  The WIC program provides supplemental food, health care referrals, and nutrition for low-income pregnant and postpartum women, and to infants and children up to age five who are nutritionally at risk.  [Doc. 1 at 2].  It provides infant formula, infant and adult cereal, juice, eggs, milk, bread, cheese, peanut butter, fresh fruits and vegetables, and dried beans or peas, and is funded and administrated through the USDA's Food and Nutrition Services Division.  Authorized vendors in the WIC program may only accept and redeem WIC vouchers in connection with the sale of eligible WIC items specifically described on each WIC food voucher.  WIC vouchers cannot be purchased or sold in exchange for cash.  [*Id.*].  According to the indictment, Defendants allegedly directed Poly-Plex employees to allow customers to exchange WIC vouchers for cash contrary to WIC rules and regulations.  [*Id.* at 4-5].  Defendants purportedly then deposited and caused to be deposited WIC vouchers illegally purchased for cash in Poly-Plex business checking accounts and falsely represented that the WIC vouchers had been legitimately acquired for authorized WIC items.  [*Id.* at 5].

3

technician for Poly-Plex, [Doc. 1 at 4], and was married to Fred, Poly-Plex's Chief Executive Officer.  [*Id.*].  Pauline is Fred's sister, and was the founding owner and operator of Poly-Plex.  [*Id.*].

The USDA agents entered the Poly-Plex location through the front door, while the APD officer waited and remained outside.  T21-23.  The agents entered the store in a single-file line; the first five agents were armed with handguns and the sixth agent was armed with a shotgun.  T5-6.  All of the agents carried their weapons in a low-ready position, meaning that their weapons were pointed towards the ground.  T6-7. They all wore protective raid vests that had either "POLICE" or "USDA" along with an official badge indicating that the agents were law enforcement.  T5.  Upon entering the 1,000 square foot pharmacy, the agents loudly stated that they were police and had a search warrant.  T6.  Immediately upon entry, the agents conducted a protective sweep of the premises, which took about ten minutes.  T7, 8.  At the time of the execution of the warrant, there were six Poly-Plex employees present, including Monica.  T7.  Monica's 12 year old daughter also was present, and was hysterically crying.  T31-32.[3]  During the protective sweep, the pharmacists stayed in the pharmacy area while the other employees were gathered on the right side of the retail area of the

---

[3]      Fred Mediko arrived about an hour after the agents first arrived.  T7.

4

store.  T8.

After conducting the sweep, the agents holstered their weapons.  T12.  They announced that they were there to execute a search warrant, and that the Poly-Plex employees were not under arrest and they could stay on the premises, but if they wanted to leave, they would not be allowed reentry while the warrant was being executed.  T7, 8, 9.  Each employee elected to remain.  T9.  Also, the agents announced that any customers who needed to get a prescription filled would be allowed to enter and then leave.  T20.

The USDA agents solicited each employee for an interview.  T8, 9, 10.  None refused to be questioned.  T10.[4]  Monica was the first person approached for an interview.  T15.  In requesting an opportunity to question her, Monica was advised by McCree that, "[i]f you don't mind we'd like to talk to you, you're not obligated to talk to us, and I just want to ask you a few questions," to which statement Monica responded affirmatively.  T16.

Monica was questioned in a private office in the back of the premises, which

---

[4]     After he arrived, Fred initially agreed to be questioned, but after a few questions, he asked to speak with his lawyer.  After calling his lawyer, he followed his lawyer's advice not to answer questions and the questioning ceased.  T10-11.  No other employee asked to consult with counsel.  T11.

5

room was located next to the restroom.  T11, 33-34.  Monica was positioned in the chair furthest from the door during the interview, while McCree and Bridges sat closest to the door.  T14.  There is no evidence that the seating arrangement was anything but happenstance.  T14, 71.[5]  The door to the office was, for the most part, left ajar during the interview, except for when the adjacent restroom was in use.  T14.

The demeanor of the interview was cordial and conversational.  T33.  Although their firearms created a bulge under their shirts, McCree or Bridges did not unholster their weapons during the interview.  T51-53.  They still wore their body armor and vests labeled with law enforcement insignia.  T11.  Monica was not promised anything in return for her cooperation, nor was she threatened or physically touched in anyway.  T53-54.  The entire interview lasted two hours.  T54.

During the interview, McCree spoke of the existence of an undercover video that purported showing Monica engaging in an illegal transaction.  T23, 36.  The interview was broken up into two segments due to McCree going back to the USDA office to retrieve the video in order show Monica its contents.  T23, 36, 54.[6]  During this

_____

[5]      Although they were in a separate room on the premises, Mediko, McCree, and Bridges were all visible from the retail area of the store.  T12-13; Govt. Ex. 1.

[6]      The first part of the interview lasted 45 minutes.  T54.  The second part of the interview lasted 30 minutes.  *Id*.  It took McCree 45 minutes to obtain the video

intermission, Monica was not handcuffed nor restrained in any way.  T55.  She was allowed to reenter the main store area where she and other store employees were watched, for safety reasons, by another agent.  T55, 67.  McCree testified that when he came back to Poly-Plex, he recalled asking Monica if she wanted to go to the backroom to watch the video.  T56.  However, Bridges could not recall if she was ordered back to the interview room for the second part of the interview.  T81.

The interview was not recorded by the agents, but instead, Bridges took notes of the interview.  T56, 69.  These notes were compiled to produce a Memorandum of Interview to support the agents' version of the events that transpired.  T34.

The agents did not read Monica her *Miranda*[7] warnings before conducting the interview, T15-16, since they did not consider her to be under arrest.  T17, 59.  Monica never requested an attorney, nor asked to terminate the interview.  T17, 59-60.  Neither Monica nor any other person at Poly-Plex was arrested that day.  T18.

### B.     *Parties' Contentions*

Monica argues that based on the totality of circumstances she was in custody and therefore needed to be read her *Miranda* warnings before being interrogated.  [Doc. 41

---

from his office.  *Id*.

[7]       *Miranda v. Arizona*, 384 U.S. 436 (1966).

at 11 (citing *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006); *United States v. Brown*, 441 F.3d 1330, 1347, 1349 (11th Cir. 2006))].  She contends that an interview being in a police-dominated atmosphere is a factor in favor of a finding that the interview was custodial.  [*Id.* (citing *United States v. Matcovich*, 522 Fed. Appx. 850, 852 (11th Cir. July 3, 2013))].  In support, she argues that the execution of the search warrant of Poly-Plex entailed a police-dominated atmosphere for the following reasons: the pharmacy was only 1,000 square feet, and yet was crammed with six armed agents in raid gear; one of the six agents was holding a shotgun; the agents took control of the pharmacy through screaming and brandishing of their weapons; Monica's daughter was crying hysterically; she could not leave the pharmacy since she would not be allowed to return; and she could not ask questions to the agents without first being subjected to an interview.  [*Id.* at 11-12].  She also argues that there was no corroborating evidence, such as written notes, memoranda, or video, to support the agents' testimony that the interview was consensual, [*id.*], stating that the only evidence the government has produced has been oral testimony from the agents and the Memorandum of Interview.  [*Id.* at 17].  The Memorandum of Interview, however, did not state how the agents approached her for the interview, and whether the agents advised her that she does not have to speak with them—two key facts that must be known in a determination of

8

custody.  [*Id.*].  She also points out that the agents were not able to recall certain key facts that would be relevant in the custody inquiry, such as: whether the agents checked her lab coat for weapons and patted her down prior to the interview; whether she was ordered to sit in the seat furthest from the door during the interview; and whether the agents told her that she could stop the interview at any time or request an attorney. [*Id.* at 13-14].[8]  She contends that even though she was never formally arrested, there are facts to support that her freedom was restrained to a degree similar to formal arrest. [*Id.* at 14-15].  That is, she was under the agents' dominion for the following reasons: the agents seized the pharmacy and exercised control over who would be allowed to come in or out; she was placed in a small backroom where she was questioned by two agents; the door of the interview room was blocked by the agents; and she was placed under guard by a different agent during the break in the interview.  [*Id.* at 14-15]. Monica contrasts this case with other Eleventh Circuit cases that found the defendants in those cases to not be in custody, pointing out that those cases involved either a situation where the defendants scheduled the date and time for agents to come and

---

[8]    Monica argues that the neither the agents' subjective beliefs, nor the fact that it is a matter of practice for the agents to conduct a consensual interview, are relevant to the custody inquiry.  [Doc. 41 at 14 (citing *J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011))].  The Court agrees with both propositions.

AO 72A
(Rev.8/8
2)

interview the defendants at their place of business or a situation where the agents unambiguously communicated to the defendants that they were free to leave at any time during the interview. [*Id.* at 15-16 (citing *United States v. Lazarus*, 552 Fed. Appx. 892 (11th Cir. Jan. 13, 2014); *United States v. Maldonado*, 562 Fed. Appx. 859 (11th Cir. Apr. 7, 2014); *Matcovich*, 522 Fed. Appx. at 852)].

Monica also argues that the Government has the burden to demonstrate that the interview was not the product of custodial interrogation. [*Id.* at 16-17 (citing *United States v. Matlock*, 415 U.S. 164, 178 (1974))]. She submits that the totality of circumstances lead to a finding that she was in custody and had to be advised of her *Miranda* rights. [*Id.* at 18].

In response, the Government argues that Monica's motion should be denied. [Doc. 42 at 6]. It asserts that she was not in custody because the agents told her she was free to leave, never restrained her movement, conducted the interview in the neutral setting of her workplace, maintained their weapons in holsters during the interview, and arrested no one on the day of the search. [*Id.*].

The Government also argues that the defendant has the burden of establishing that she was held in custody during this interview, [*id.* (citing *United States v. Blocker*, No. 1:14-CR-228-AT-AJB, 2016 WL 3281018, at *16 (N.D. Ga. Feb. 29, 2016),

10

*adopted by*, No. 1:14-CR-228-AT, 2016 WL 3259096 (N.D. Ga. June 14, 2016))]; and contends that her citation to *Matlock* for the proposition that the Government bears the burden of proving that an interview was not custodial is inapposite, since *Matlock* never addressed the issue of custodial interrogations, but instead addressed the issue of consent to search a premises. [*Id.* (citing *Matlock*, 415 U.S. at 178)].

The totality of the circumstances, the Government asserts, establishes that Monica's questioning was not a custodial interrogation because: (1) the interview took place at her workplace; (2) she was told she was free to leave; (3) she was not physically restrained or handcuffed during the interview; (4) the agents did not brandish weapons during the interview; (5) the interview was not excessively long in duration; (6) the agents questioned her in a normal tone of voice and did not touch her during the interview; and (7) no one was arrested at the conclusion of the interview or search. [*Id.* at 7-8]. It further submits that courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings of the defendant. [*Id.* at 8 (citing *Matcovich*, 522 Fed. Appx. at 851; *Brown*, 441 F.3d at 1348)]. It posits that the backroom of the pharmacy is a familiar or at least neutral surrounding. [*Id.*]. The Government also states that she was unambiguously told that she was free to leave and was not under arrest, a powerful factor in the custody

11

inquiry. [*Id.* at 9 (citing *Matcovich*, 522 Fed. Appx. at 851)]. The agents told all employees after the protective sweep that they were free to leave and no one was under arrest. [*Id.* at 9]. The agents also told Monica that she was not obligated to speak to them, and instead, she voluntarily chose to stay. [*Id.* at 9-10]. The Government also points out that Monica was never handcuffed, and although she claims that the interview was custodial because the environment was police-dominated, courts have recognized that such temporary physical restraint for officer safety during a search warrant execution does not mean that occupants are in custody. [*Id.* at 10-11 (citing *Matcovich*, 522 Fed. Appx. at 852; *United States v. Young*, No. 316-CR-00006-TCB-RGV, 2017 WL 653556, at *5 (N.D. Ga. Jan. 25, 2017))].

It next argues that the coercive environment that exists in virtually every interview by a police officer is not sufficient to establish a custodial interrogation. [*Id.* at 7 (citing *Matcovich*, 522 Fed. Appx. at 851; *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000))]. The Government also argues that the temporary detention of occupants during a search warrant does not automatically transform the search into a custodial interrogation. [*Id.* at 12 (citing *Michigan v. Summers*, 452 U.S. 692, 701-02 (1981))].

Further, the Government claims the fact that no guns were brandished during the

12

interview is a factor weighing against a finding of custody. *See Street*, 472 F.3d at 1309. Courts have long recognized that brandishing firearms upon entry in a search warrant execution does not make subsequent questioning custodial if the weapons are holstered during the interview. [*Id.* at 12 (citing *Matcovich*, 522 Fed. Appx. at 852; *United States v. Luna-Encinas*, 603 F.3d 876, 881-82 (11th Cir. 2010))]. The Government maintains that the ambiguity of whether after the protective sweep the shotgun remained visible during Defendant's interview should be construed in its favor since it is Defendant's burden to prove that she was in custody. [*Id.* at 13 (citing *Blocker*, 2016 WL 3281018, at *17)].

The Government also contends that the questioning was not lengthy, since the interview lasted two hours, citing T16-17, 54, 56; and noting that courts have had cases last much longer than that, upwards of seven hours, but yet still find that the defendants in those cases were not in custody. [Doc. 42 at 13 (citing *Howes v. Fields*, 565 U.S. 499, 515 (2012); *United States v. McDowell*, 250 F.3d 1354, 1363 (11th Cir. 2001); *Muegge*, 225 F.3d at 1269, 1271)]. The Government also indicates that Defendant took a break during the interview, and chose to stay and be re-interviewed when Agent McCree came back with the undercover video. [*Id.* at 13-14]. It also submits that the agents not touching Monica or using an aggressive tone to

13

compel her compliance also lead to a conclusion that this was not a custodial interrogation.   [*Id.* at 14 (citing *Street*, 472 F.3d at 1309; *Luna-Encinas*, 603 F.3d at 881)].

Finally, the Government contends that the fact that Monica was not formally arrested after the interview further demonstrates that she was not in custody. [*Id.* at 14-15 (citing *Howes*, 565 U.S. at 509; *Matcovich*, 522 Fed. Appx. at 852; *United States v. Herron*, No. 2:14-CR-23-FtM-38DNF, 2015 WL 867309, at *17 (M.D. Fla. Feb. 4, 2015))].   It submits that the totality of circumstances shows that Monica was not in custody, and that this interview was merely routine questioning incident to the execution of a search warrant, and therefore the agents had no need to read Monica her *Miranda* rights.  [*Id.* at 15-16].

The Government also contends that Monica voluntarily made her statements to the agents as evidenced by the lack of any coercion, physical force, or promises, and her clear understanding of the agents' questions in this non-custodial setting.  [*Id.* at 6]. It notes that in *Blocker*, the court found that the defendant's statements were voluntary based on the facts that: (1) the defendant's intelligence was demonstrated by his computer science degree; (2) the length of questioning was only two to four hours with no indication that the defendant was unwilling to answer questions; (3) any physical

14

force was limited to grabbing the defendant to remove him from the house; (4) the defendant volunteered to assist the agents during questioning; (5) law enforcement did not communicate any sort of promises or inducements; and (6) the agents did not trick or deceive the defendant in any way.  [*Id.* at 17 (citing *Blocker*, 2016 WL 3281018 at *19)].  The Government argues that this case is very similar to *Blocker*, in that: Monica's intelligence is demonstrated by her occupation as a pharmacy assistant, a job that requires the ability to assist pharmacists and respond intelligently to patients' questions, [*id.* at 17]; Monica was only questioned for two hours with an hour-long break, and she never asked to terminate the interview nor ever requested an attorney. [*Id.* at 18].  The Government maintains that she was never physically touched throughout the interview.  [*Id.*].  The agents never promised nor threatened Monica. [*Id.*].  It additionally argues that there is no evidence that the agents engaged in any trickery or deceit in approaching her for an interview.  [*Id.*].  Indeed, the Government points out that Monica actively assisted the agents during the interview by volunteering to show agents material in her email account on the computer.  [*Id.*].  The Government concludes that in totality the record supports that Monica gave her statements voluntarily.  [*Id.* at 18].

In reply, Monica contends that the familiar setting of the interview does not

AO 72A
(Rev.8/8
2)

matter if it is drowned out by a police-dominated atmosphere as the case is here. [Doc. 43 at 5]. She argues that the record, including the Memorandum of Interview, fails to support the Government's assertion that she was unambiguously advised that she was free to leave. [*Id.* at 8]. Monica also contends that she was a target pursuant to a USDA investigation, [*id.* at 9], and that a reasonable person under government investigation would feel compelled to stay for the interview and watch the content of Agent McCree's video to offer a rebuttable explanation. [*Id.*].

As for voluntariness, Monica argues that the issue of voluntariness is determined by examining the totality of the circumstances and the burden is on the Government to establish, that a statement is voluntary. [*Id.* at 14-15 (citing *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010))]. She argues that she was surprised at her place of employment by agents with a warrant, where the agents indicated to her before the interview that she was the focus of their investigation. She contends that she did not voluntarily participate in this interview. [*Id.* at 15].

In sur-reply, the Government argues that Monica's assertion that in order to be a voluntary statement a defendant must speak to the Government is incorrect. [Doc. 44 at 1]. It points out that Monica cited no case law in support of this proposition, and whether she spoke unprovoked by law enforcement officials is irrelevant in the

voluntariness inquiry.  [*Id.* at 1-2 (citing *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996))].  The Government also argues that Defendant is incorrect in stating that it is relevant in the voluntariness calculus when the agents told her that if she left the pharmacy she could not come back until after the search warrant is complete. [*Id.* at 2].  The Government argues that offering the option to stay or leave for good during the execution of a search warrant should not factor into whether she was exposed to a coercive setting.  [*Id.* at 2 (citing *Young*, 2017 WL 653556, at *2, 6)]. Finally, the Government argues that Monica's contention that her interview was involuntary due to her being the target of the investigation is incorrect because there will always be coercive aspects to any law enforcement interview, but that does not mean that conduct is egregious enough where the interview would be involuntary. [*Id.* at 2-3 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977))].

### C.     *Discussion*

Monica's motion to suppress raises two issues: (1) whether she was in custody at the time of the questioning, and thus the agents were required to advise her of the *Miranda* warnings before questioning her; and (2) whether her statements were made voluntarily, and not the product of coercion by law enforcement.

17

### 1.    *Custody*

The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself."  U.S. Const. Amend. V.  Based on this Fifth Amendment right against self-incrimination, the Supreme Court adopted a rule in *Miranda v. Arizona*, 384 U.S. 436 (1966), that "certain warnings must be given before a suspect's statement made during custodial interrogation could be admitted in evidence."  *Dickerson v. United States*, 530 U.S. 428, 431-32 (2000).

"The right to *Miranda* warnings attaches when custodial interrogation begins." *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004).  Thus, *Miranda* does not apply "outside the context of the inherently coercive custodial interrogations for which it was designed."  *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984).  A defendant is in custody for *Miranda* purposes when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) (quoting *New York v. Quarles*, 467 U.S. 649, 655 (1984)). "[W]hether a suspect is 'in custody' is an objective inquiry."  *J.D.B.*, 564 U.S. at 270; *see Street*, 472 F.3d at 1309 (holding that the custody inquiry is an objective standard from the perspective of a reasonably innocent person).  Thus, the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free

18

to leave are irrelevant, and the reasonable person from whose perspective "custody" is defined is a reasonable innocent person.  *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (quotations, citations, alteration, and emphasis omitted).  Therefore, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable [person] in the suspect's position would have understood his [or her] situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

The defendant bears the burden of demonstrating that she was subjected to custodial interrogation.  *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1978) ("[I]f a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination.")[9]; *see also United States v. Peck*, 17 F. Supp. 3d 1345, 1353-54, 1362 (N.D. Ga. 2014) (Totenberg, J., *adopting* Baverman, M.J.) (lengthy discussion that *de le Fuente* still requires defendant to first carry the burden in showing he was in custody and that *Miranda* warnings are necessary).  The Eleventh Circuit considers several factors in applying this objective

---

[9]      Decisions of the Fifth Circuit rendered on or before September 30, 1981, are binding precedent in the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

19

test, "including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled." *Street*, 472 F.3d at 1309 (internal quotation marks omitted); *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1989); *see also Howes*, 565 U.S. at 508 (citations omitted) (identifying some factors to consider, including location of the questioning, its duration, the types of statements made during the questioning, the presence of physical restraints, and the release of the suspect at the end of the questioning); *Brown*, 441 F.3d at 1348-49 (holding that defendant was not in custody in part because he was in a familiar setting—his girlfriend's house—and because, "[a]lthough an officer accompanied him throughout the house for safety reasons, he was free to eat, smoke, use the phone, and move about as he wished").

In this case, Monica did not establish that she was subject to custodial interrogation. Here, every factor that courts have considered in a custody analysis point away from a finding of custody. "The circumstances before the court fall outside the *Miranda* paradigm[,] that is, interrogation of a suspect at the police station, or similar circumstances establishing the functional equivalent of an arrest requiring *Miranda* warnings." *United States v. Toumasian*, No. 1:10-CR-0291-TCB-JFK-3, 2011 WL 3798223, at *10 (N.D. Ga. July 19, 2011) (internal citation and quotation

marks omitted), *report and recommendation adopted*, No. 1:10-CR-291-TCB-3, 2011 WL 3738980 (N.D. Ga. Aug. 22, 2011).

First, the questioning not only occurred at her place of work, but also in a private office.  T11, 33-34.  "[C]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the [defendant]'s home." *Brown*, 441 F.3d at 1348 (alteration and internal quotation marks omitted); *see also Luna-Encinas*, 603 F.3d at 882 (same); *United States v. Lazarus*, 552 Fed. Appx. 892, 894 (11th Cir. Jan. 13, 2014) (defendant not in custody when interviewed "at a neutral location, an office at her workplace"); *United States v. Sosa*, Case No. 1:15-cr-20170-KMM, 2015 WL 6751062, at *3 (S.D. Fla. Nov. 5, 2015) (finding no custody and stating, "The interview took place at Sosa's place of business, a factor which is particularly relevant to the custody analysis.") (citing *Brown*, 441 F.3d at 1348); *United States v. Basil*, 268 F. Supp. 1018, 1020 (S.D. Fla. 1967) (finding no custody where defendant was questioned in his own office, with his wife and employees present on the premises).

Second, the questioning only lasted two hours and over a third of this time was not spent actually questioning, but just waiting for the session to proceed again.  T54.  Similar periods of questioning have found to not constitute custody for *Miranda*

21

purposes. *Muegge*, 225 F.3d at 1269-71 (two-and-a-half hours); *Yarborough v. Alvarado*, 541 U.S. 652, 655-58 (two hours).

Third, the agents told Monica that she was not under arrest and could leave the premises. T7. The Court finds the agents' testimony credible on this point despite Bridges not including it in his Memorandum of Interview. "Unambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is not in custody absent a finding of restraints that are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.' " *Brown*, 441 F.3d at 1347 (quoting *Muegge*, 225 F.3d at 1271). Further, McCree asked Monica if she would like to be questioned, T10, 15, 16, and advised her that she was not obligated to speak to them. T16. Such a statement was found to be proof of no custody in *Matcovich*, 522 Fed. Appx. at 852.

Fourth, the agents did not promise Monica any benefit for answering questions, nor did they threaten nor physically touch her in anyway. T53-54. Fifth, Monica was never handcuffed, T55, nor did the agents ever brandish their weapons at her. T51-53; *see United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996) ("[n]o handcuffs [being] employed, and no guns [being] drawn" is a factor that disfavors a finding of custody);

22

*see also United States v. Colon*, 579 Fed. Appx. 791, 793-94 (11ᵗʰ Cir. Sept. 2, 2014) (finding defendant not in custody where he was interrogated in his home, was told he was not under arrest and did not have to talk to the agents, he was spoken to in a conversational tone and the agents did not unholster their weapons, and he was not handcuffed or otherwise physically restrained during the questioning).[10]

---

[10]    Any restraint placed upon Monica and the premises other occupants when the agents first entered Poly-Plex and conducted the protective sweep does not rise to the level of custody.   *United States v. Bird*, No. CR 317-001, 2017 WL 9482459, at *17 (S.D. Ga. Sept. 27, 2017) (observing that "even if officers gave Defendant some direction concerning where he should be in the office during the search, this does not convert the 'totality of the circumstances' from non-custodial to custodial"), *report and recommendation adopted* 2017 WL 5714689 (S.D. Ga. Nov. 28, 2017); *see also Matcovich*, 522 Fed. Appx. at 852 (no custody where officers temporarily handcuffed residents and placed them in central location); *United States v. Varnell*, No. 1:13-CR-394, 2014 WL 5517923, at *3, 7-8 (N.D. Ga. Oct. 28, 2014) (Totenberg, J., *adopting* Walker, M.J) (no custody where agents escorted all members of residence, including defendant, to living room while executing search); *United States v. Graham*, No. 3:13-CR-11-TCB, 2014 WL 2922388, at *3, 6-7 (N.D. Ga. June 27, 2014) (Batten, J., *adopting* Vineyard, M.J.) (no custody where fifteen agents temporarily placed defendant and fellow residents in handcuffs and transported them to central location in house).

     Moreover, Monica was not in custody when she was guarded by an agent while waiting for McCree to return with the undercover video, T67, since this temporary restraint of movement does not rise to the level of formal arrest.  *See United States v. Opoku*, 210 Fed. Appx. 848, 849, 852 (11ᵗʰ Cir. Dec. 13, 2006) (holding that defendant was not in custody where he "left the table several times during the interview, but, as a safety precaution, the agents always followed him or kept him in sight . . . Thus, there was no indication by the agents' conduct that [defendant] was restrained to such a degree as is associated with a formal arrest").

AO 72A
(Rev.8/8
2)

Sixth, although the agents might have entered the pharmacy forcefully and in a shouting manner, which is normal practice in the execution of search warrant, T22, the questioning was conducted in a conversational tone, which is what ultimately matters in a custodial determination.   T33; *see Matcovich*, 522 Fed. Appx. at 852 (finding interview conducted during the execution of a search warrant was not custodial even though entry by law enforcement created a " 'police-dominated atmosphere' with a number of officers handcuffing residents and bringing them to a central location," but "shortly thereafter, the search warrant was announced, the handcuffs were removed, and the residents were told that they were not under arrest").   Finally, Monica was not taken into formal custody at the end of the interview.   T17, 59; *see Howes*, 565 U.S. at 508; *United States v. Whitaker*, 735 Fed. Appx. 672, 675 (11th Cir. June 4, 2018) (quoting *Howes*, 565 U.S. at 509, and noting that defendant was permitted to leave the building after questioning concluded).[11]

---

[11]     Monica argues that the execution of the search warrant led to her being exposed to an atmosphere that was similar to formal arrest.  [Doc. 43 at 5].  She also argues that she was more likely in custody because she was the target of a USDA investigation, and no reasonable person would feel free to leave during the agents' questioning.  [Doc. 43 at 9].  It is true that police seized the building and the occupants therein during the execution of this search warrant, T5-7, 20, where the agents undertook a protective sweep, T6-7 and perhaps conducted patdowns of the occupants.  T65.  "[A] reasonable person in the [D]efendant's position may feel constrained not to leave the scene of a police encounter at a particular moment – and

AO 72A
(Rev.8/8
2)

Based on the totality of the circumstances, Monica was not in custody, and therefore did not need to be read the *Miranda* warnings.[12]

---

thus may be deemed to have been 'seized' by law enforcement – [s]he will not necessarily be considered in 'custody' for Fifth Amendment purposes." *Luna-Encinas*, 603 F.3d at 881 (citations omitted and emphasis in original). Freedom of movement limitations pursuant to a search warrant are "tempered by the fact that they [] only last for the time it [takes] to search the [premises] and thus had an expected endpoint, unlike the more open-ended prospect of a formal arrest, which is followed by book-in at a jail and presentment to a judge for the (potential) setting of a bond." *Peck*, 17 F. Supp. 3d at 1363. *Miranda* is not implicated simply because an individual is the subject or target of an investigation. *See United States v. Manor*, 936 F.2d 1238, 1241 (11th Cir. 1991) ("The fact that [defendant] may have been a target of either the grand jury or of a police investigation is irrelevant. The Supreme Court has clearly stated that *Miranda* is not implicated simply because an individual is the subject or target of an investigation.") (citing Minnesota v. Murphy, 465 U.S. 420, 431 (1984)). "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Mathiason*, 429 U.S. at 495. "But police officers are not required to administer *Miranda* warnings to everyone whom they question." *Id.* "Nor is the requirement of warnings to be imposed simply because . . . the questioned person is one whom the police suspect." *Id.*; *Muegge*, 225 F.3d at 1270 (status as a "suspect," and " 'coercive environment' that exists in virtually every interview by a police officer of a crime suspect, did not automatically create a custodial situation"); *see also Peck*, 17 F. Supp. 3d at 1365 ("Pointed questioning, however, does not necessarily convert a non-custodial interview into a custodial interrogation.").

[12] Monica contends that the agents were not been able to recall certain key facts that would be relevant in the custody inquiry, such as: whether the agents checked her lab coat for weapons and patted her down prior to the interview; whether she was ordered to sit in the seat furthest from the door during the interview; and whether the agents told her that she could stop the interview at any time or request an attorney. [Doc. 41 at 13-14]. "[G]iven that the burden is upon [defendant] to demonstrate that

25

2. *Voluntariness*

Regardless of whether Defendant was in custody or not, the Government must prove that her statements were voluntary. *Lall*, 607 F.3d at 1285; *see also Jarrell v. Balkcom*, 735 F.2d 1242, 1252 & n.11 (11th Cir. 1984) (observing that although *Miranda* and *Jackson v. Denno* protect Fifth Amendment rights, *Jackson* "raises an issue distinct from the *Miranda* question in determining a confession's admissibility

--------

[s]he was in custody, [any] ambiguity in the record . . . does not inure to [defendant's] benefit." *Blocker*, 2016 WL 3281018, at *17. Moreover, even if Monica was patted down, such action does not amount to being in custody for *Miranda* purposes. *United States v. Zellner*, No. 1:09-CR-320-TCB-GGB, 2011 WL 530718, at *7-8 (N.D. Ga. Jan. 14, 2011), *report and recommendation adopted by United States v. Chester*, No. 1:09-cr-320-TCB-GGB, 2011 WL 529952, at *1 (N.D. Ga. Feb. 4, 2011) (defendants not in custody for *Miranda* purposes during a 30-45 minute encounter in a parking lot where there were multiple armed officers in "battle dress uniforms" with dogs, the officers blocked defendants' vehicle from exiting the parking lot, the officers drew but never pointed their guns at defendants, the defendants were never handcuffed, the officers did not raise their voices and engaged defendants in a conversational tone, and the officers only touched defendants to perform a brief pat down for weapons). Further, even if she was told where to sit, which conclusion is not supported by the record, such direction, without any force, likewise does not rise to the level of being in custody. *United States v. Perry*, No. 116CR00334MHCLTW, 2017 WL 9473406, at *6 (N.D. Ga. Aug. 4, 2017) ("Even if Defendant was told to have a seat and directed where to have a seat on the back deck, there is no evidence that these actions were undertaken with any force, much less more than minimal force."), *report and recommendation adopted*, No. 1:16-CR-334-MHC-LTW, 2017 WL 4031469 (N.D. Ga. Sept. 13, 2017). That is, although Monica had some restriction in her movement while the search of her business location was ongoing, the agents did not restrict her freedom to such a degree that a reasonable innocent person would believe she was in "custody." *United States v. Stinson*, 659 Fed. Appx. 534, 536 (11th Cir. Aug. 10, 2016).

26

and [t]hus, even if a court finds compliance with *Miranda*, the court must still rule on the confession's voluntariness."). "The standard for evaluating the voluntariness of a confession is whether a person made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him. Voluntariness depends on the totality of the circumstances and must be evaluated on a case-by-case basis." *United States v. Rivera*, 372 Fed. Appx. 958, 963 (11th Cir. Apr. 14, 2010) (citation omitted). The Court must consider the totality of the circumstances in assessing whether law enforcement conduct was "causally related" to the incriminating statements made. *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988). This totality-of-the-circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. *See*, *e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996). However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear

27

on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted).  Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Colorado v. Connelly*, 479 U.S. 157, 163 n.1 (1986); *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984).   In considering the totality of the circumstances, it is important to keep in mind that in any arrest or custodial situation there is present a degree of duress.  The question is whether the officers used coercive tactics or took unlawful advantage of the situation to obtain the defendant's waiver or statements.  *Cf. United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973) (in discussing consent to search following arrest, asking: "In other words, was there a use of coercive tactics by the arresting officers such that the duress present in a particular exceeds the normal duress inherent in any arrest?"); *see also United States v. Smith*, 199 Fed. Appx. 759, 763 (11th Cir. Sept. 15, 2006) (quoting *Jones*, *supra*).

As stated before, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with

28

a crime." *Mathiason*, 429 U.S. at 495.   However, courts have recognized that non-custodial interviews are not nearly as "inherently coercive" as those that take place while a suspect is in custody. *Schneckloth*, 412 U.S. at 247; *Miranda*, 384 U.S. at 477-78; *accord United States v. White*, 846 F.2d 678, 689 (11th Cir. 1988) ("The same concerns do not exist when interrogation does not occur in custody.").   The question is whether the officers used coercive tactics or took unlawful advantage of the situation to obtain the defendant's statements. *Cf. Jones*, 475 F.2d at 730 (discussing consent to search following arrest); *see also Lall*, 607 F.3d at 1285 (non-custodial statements are "voluntary," and thus admissible, if they are "not extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight") (quoting *Bram v. United States*, 168 U.S. 532, 542 (1897)); *Stinson*, 659 Fed. Appx. at 537 ("[C]onsidering the totality of the circumstances, Stinson was not in custody during the interview and, given these circumstances as well as the absence of threats, violence, or other forms of coercion, his statements to the police were made voluntarily.").

The Court concludes that Monica's statements were made voluntarily.[13]   In considering the voluntariness factors, the circumstances of the case demonstrate that

---

[13]      Monica addressed voluntariness in her post-hearing brief and reply brief in a very fleeting fashion.  [*See* Docs. 41 & 43].

her statements were not coerced by law enforcement.  First, as laid out above, the present case dealt with a non-custodial interview.  Second, Monica has at least a moderate level of education, as demonstrated by her profession as a pharmacy technician.  T15; Govt. Ex. 2 at 1; *see United States v. Vanbrackle*, 397 Fed. Appx. 557, 562 (11th Cir. Sept. 23, 2010) (noting in voluntariness analysis that defendant had four years of college); *Blocker*, 2016 WL 3281018, at *19 ("Blocker had a degree in computer science . . . which certainly demonstrates his intelligence for voluntariness purposes."); *cf. Spano v. New York*, 360 U.S. 315, 321-22 (1959) (finding confession involuntary in part due to the defendant only having one-and-a-half years of a high school education).  A pharmacy technician under Georgia law must be currently enrolled in high school, have a high school diploma, a GED, or a postsecondary education or college degree.[14]  The Defendant's age is not revealed during the *Jackson-Denno* hearing, but it is worth noting that she has a twelve-year old daughter.  T66; *see United States v. Avellaneda-Dimas*, No. 1:17-CR-338-ELR-JSA, 2018 WL 4558911, at *7 (N.D. Ga. July 24, 2018) (citing *Schneckloth*, 412 U.S. at 226) (courts can also consider the age of the accused in a voluntariness analysis).  Third, Monica was

---

[14]   Georgia Board of Pharmacy Rule 480-15-.02(b)(3), http://rules.sos.ga.gov/gac/480-15?urlRedirected=yes&data=admin&lookingfor=480-15 (last visited 12/31/2018).

AO 72A
(Rev.8/82)

questioned for a total of two hours. T54. The Eleventh Circuit has found interrogations of similar duration to be voluntary, *Brown v. Jones*, 255 F.3d 1273, 1282 (11th Cir. 2001), as have district courts in this Circuit. *United States v. Winders*, No. 117CR00313ELRAJB, 2018 WL 5779191, at *5 (N.D. Ga. Sept. 17, 2018), *report and recommendation adopted*, No. 117CR00313ELRAJB, 2018 WL 5726197 (N.D. Ga. Nov. 1, 2018); *United States v. Intakanok*, No. CR 114-060, 2014 WL 4825368, at *5 (S.D. Ga. Sept. 25, 2014); *United States v. Shepherd*, No. 1:11-CR-00058-ODE-RGV, 2011 WL 4443440, at *8 (N.D. Ga. Aug. 23, 2011), *report and recommendation adopted*, No. 1:11-CR-0058-ODE-RGV, 2011 WL 4443435 (N.D. Ga. Sept. 21, 2011). *Cf. United States v. Frank*, 599 F.3d 1221, 1229 (11th Cir. 2010) (two hour interview by Cambodian officers did not shock the conscience); *Martin v. Wainwright*, 770 F.2d 918, 927 (11th Cir. 1985), *modified on other grounds*, 781 F.2d 185, (11th Cir. 1986) (no coercion in spite of five hours of interrogation).

Fourth, the nature of the interrogation was cordial and conversational. T33; *see Peck*, 17 F. Supp. 3d at 1365 ("[T]he tone of the questioning as demonstrated by the recording was conversational, calm, deliberate, and not threatening, and did not convey that compliance was compelled."). Fifth, Monica was never physically touched,

31

harmed, nor threatened in any way.  T53-54.  Finally, the agents never made any promises to Monica.  T53-54.  The totality of the circumstances point to the conclusion that Monica engaged in the questioning voluntarily, and not as a result of governmental coercion.  *See Miller*, 838 F.2d at 1536.

As a result, the undersigned **RECOMMENDS** that Monica's motion to suppress statements, [Doc. 32], be **DENIED.**

### III.    Motion to Suppress, [Doc. 34]

Defendants filed a motion to suppress evidence seized pursuant to search warrants.  [Doc. 34].  No copy of the warrant or application was attached to the motion.  [*See id.*].  At the pretrial conference, [Doc. 35], Defendants were given an opportunity to perfect the motion, but they never did.  (*See* Dkt.).

Accordingly, the undersigned **RECOMMENDS** that the motion to suppress evidence pursuant to search warrant, [Doc. 34], be **DENIED AS ABANDONED**.

### IV.    Motion to Suppress, [Doc. 38]

Defendants also moved to suppress evidence of emails ands electronically stored information seized pursuant to warrant.  [Doc. 38].

### A.    Facts

On June 27, 2013, a federal search warrant issued for three email accounts at

32

Yahoo!: monicamediko@yahoo.com, mboe727@yahoo.com, and mattieschild1@yahoo.com. [Doc. 38-1 at 1-6]. McCree was the affiant on the application. In his affidavit, McCree recounted that WIC is a nutritional program that provides supplemental foods, health care referrals, and nutrition education for low-income pregnant, breastfeeding, and non-breastfeeding postpartum women and to infants and children up to age five who are found to be nutritionally at risk, and that the USDA Food and Nutrition Service administers the WIC program at the federal level and provides funds to the Georgia Department of Public Health ("GDPH") for implementation in Georgia. GDPH provides WIC benefits to program participants in a traditional paper food instrument/voucher system through state, district, and local health offices. [Doc. 38-2 at 4]. The affidavit also stated that in order to participate in WIC, a retail grocery vendor was required to attend a training class, pass an evaluation, and submit a signed "WIC Vendor Agreement" that explains the vendor's responsibilities for participating in WIC. The applicant then receives an on-site pre-approval visit from GDPH to determine if the store has the required minimum amount of WIC-authorized food items, which the store is required to maintain during the authorization period. [*Id.*]. McCree also averred that GDPH requires authorized WIC grocery vendors to abide by the rules and procedures detailed in the "Vendor

33

Guidelines and Procedures Handbook" and all addendums, and the vendor or authorized representative also must sign an "Annual Vendor Training Checklist" acknowledging the vendor's understanding of the program requirements, which provide that under no circumstances may WIC vouchers be purchased or sold in exchange for cash, nor may stores swap, transfer, or exchange WIC vouchers between stores.  [*Id.* at 4-5].

McCree also explained that Computer Sciences Corporation ("CSC") functions on behalf of WIC as the clearinghouse for the processing, approval, and redemption of WIC benefits.  McCree stated that when a WIC recipient uses a WIC-authorized voucher at the store, the store employee is required to verify that the recipient is buying only the listed items on that voucher.  The voucher is then treated like a regular check. The store vendors deposit all WIC voucher checks into their designated store bank accounts, and at the end of each day, CSC sends a record of all WIC vouchers used at a store to United Community Bank, which then wires the total WIC payment into the vendor's bank account.  USDA-OIG agents have the ability to query CSC's WIC Banking database and search for the vouchers after their redemption via the identification information.  When vouchers are deposited into a bank, a copy of the front and back of the redeemed voucher is saved in the WIC Banking

34

database.  [*Id.* at 5].

McCree's affidavit then provided that since November 2005, Poly-Plex had been enrolled into the WIC program as an authorized retailer to accept WIC vouchers as payment for providing food products and prescription baby formulas to WIC recipients. GDPH classified Poly as a small store because its square footage was approximately 825 square feet and classified stores such as Wal-Mart, Publix, and Kroger that have square footage greater than 15,000 as chain stores.  The Georgia WIC Information System database revealed that from Fiscal Year 2009 through Fiscal Year 2013, Poly-Plex received approximately $6.9 million for its redemption of WIC vouchers. However, during that same time period, the WIC redemptions for large major retail chain grocery stores in relatively close proximity to Poly-Plex (less than seven miles), such as Walmart, Publix, and Kroger, were significantly less than Poly-Plex, totaling $444,955 combined.  [*Id.* at 5-6].

McCree then recounted that an analysis of the WIC Banking database as well as the Georgia WIC Information System database disclosed that Poly-Plex was redeeming WIC vouchers from recipients that were located throughout the state of Georgia in addition to local WIC recipients.  He noted that Poly-Plex is not a large major retail chain store, it has only one location with minimal food inventory, and no shopping

35

carts.  At the time of the application for the search warrant, Poly-Plex averaged $83,000 per month in WIC redemptions.  Based upon those facts, it appears that these recipients, or persons on their behalf, were traveling throughout the state of Georgia to conduct unlawful WIC transactions at Poly-Plex.  He provided a chart of the names, location, and distance of some of the WIC recipients whose WIC vouchers had been deposited by Poly-Plex, including persons from Waycross, Ga., 240 miles away; Tifton, Ga., 188 miles away; Grovetown, Ga., 144 miles away; McCaysville, Ga., 112 miles away; and Summerville, Ga., 91 miles away.  [*Id.* at 6-7].

Next, McCree noted that on October 21, 2011, GDPH investigators conducted a routine vendor monitoring visit at Poly-Plex, and upon arrival met with Fred, who identified himself as the store manager.  Poly-Plex had minimal food inventory even though its WIC redemptions for the month of October 2011 were approximately $81,000.  [*Id.* at 7].  GDPH's review of Ploy-Plex's food purchase invoice receipts for August and September 2011 disclosed that its combined food purchases from vendors during the above months totaled approximately $20,447, but its WIC redemptions totaled approximately $47,900, leading to the conclusion that Poly-Plex sold more WIC food items in those months than it purchased from vendors based upon the amount of WIC vouchers that were deposited for the sale of WIC food items.   [*Id.*].

36

On December 31, 2011, GDPH investigators made a monitoring visit to the store, and again it had minimal food inventory, but its WIC redemptions for the month of December 2011 were approximately $113,000.  [*Id.*].

The affidavit went on to relate that on June 19, 2012, an undercover operative ("UC") entered a retail store in Marietta, Ga., that was under investigation for purchasing WIC vouchers for cash.  The UC successfully sold 27 WIC vouchers for cash at this store, and on July 13, 2012, one of the vouchers sold for cash at the Marietta retail store was redeemed by Poly-Plex in the amount of $91, leading McCree to conclude, based on his training and experience, that Poly-Plex acquired the illegally obtained WIC voucher from the Marietta retail store and deposited it for redemption.  [*Id.* at 8].

McCree then noted that on April 2, 2013, a WIC recipient, was interviewed and during this interview, she was shown copies of WIC vouchers that were issued in the name of her daughter and subsequently deposited by Poly-Plex.   The witness stated that she had never been to or heard of Poly-Plex, while admitting that these WIC vouchers were sold by her for cash at a WIC store that was located in the West End area of Atlanta.  [*Id.*].

McCree also related that on August 6, 2012, a UC visited Poly-Plex and

37

approached Monica, identified in the affidavit as a Pharmacist Technician of Poly-Plex and Fred's wife. The UC inquired about selling WIC vouchers for cash. Monica asked the UC who told the UC that Poly-Plex purchased vouchers, and the UC provided her with a fictitious name. Monica gave the UC a business card with a number to call. Monica told the UC that the owner had another store in College Park and that this store would have to fill an order (i.e. food items purchased with WIC vouchers) before she would purchase WIC vouchers from the UC. [*Id.*].

The affidavit continued that on September 26, 2012, the UC phoned Monica regarding food delivery and the sale of WIC vouchers to Poly-Plex. Monica asked the UC to bring the WIC vouchers to Poly-Plex and how many vouchers the UC wanted to sell as well as the WIC voucher codes. After the UC provided her with the codes, Monica told the UC that she would buy the WIC vouchers for $34. Later that day, the UC went to Poly-Plex where Monica bought six WIC vouchers from the UC for $34 in cash without selling any food products to the UC. The WIC Banking database revealed that Poly-Plex was paid $236 after depositing these WIC vouchers for payment, which resulted in an unlawful profit of $202. [*Id.* at 8-9]. Then, on November 5, 2012, the UC sold six WIC vouchers to Monica at Ploy-Plex for $121 in cash, without buying any food products. The WIC Banking database revealed that

38

Poly-Plex was paid $250 after depositing five of six of these WIC vouchers for payment, which resulted in an illegal profit of $129.[15]  While participating in this WIC transaction, the UC overheard a phone conversation between an unknown individual known as "Fred" and a female customer, who stated that she was waiting on Fred to bring money to the store to purchase the WIC vouchers.  McCree belied that "Fred" was Ferdinand Mediko.  [*Id.* at 9].

McCree further explained that on December 7, 2012, the UC entered Poly-Plex and sold nine WIC vouchers to Monica for $180 in cash, without any food products.  The WIC Banking database revealed that Poly-Plex was paid $513 after depositing these WIC vouchers for payment.  [*Id.*].

Then, on January 25, 2013, Monica told the UC during a phone conversation that Poly-Plex was no longer buying WIC food vouchers and instructed the UC to request prescription WIC baby formula vouchers from Georgia WIC.  Monica instructed the UC to ask for certain brands of baby formula, including EleCare, and also told the UC that she could no longer buy WIC food vouchers because she was having problems with the WIC Company (i.e. Georgia WIC).  On February 22, 2013, the UC went to Poly-Plex and sold six EleCare formula WIC vouchers to Monica for $400 in cash.  Monica

---

[15]    As of the time of the affidavit, one of those vouchers was unaccounted for.

AO 72A
(Rev.8/8
2)

told the UC that the UC would have been paid more money if the UC had brought Peptamen formula vouchers.  The UC left Poly-Plex without any food products.  The WIC Banking database reflected that Poly-Plex received $1,026 for four of the vouchers, an unlawful profit of $626.[16]  [*Id.* at 10].  On April 12, 2013, when the UC sold six EleCare formula WIC vouchers to Monica for $240 in cash, Monica asked the UC why the UC did not bring Peptamen WIC vouchers, who responded that those types of vouchers were not available.  The WIC Banking database showed Poly-Plex receiving $1,344 after depositing these WIC vouchers for payment, which resulted in an unlawful profit of $1,104.  [*Id.* at 10].

On June 11, 2013, USDA-OIG agents executed a federal search warrant for Poly-Plex's premises.  During the search, agents located paper print-outs of seven e-mail messages sent to the email addresses for Monica (monicamediko@yahoo.com) and Fred (mboe727@yahoo.com).  The e-mails, dated from February 15, 2013 through June 11, 2013, reflected communications from "Janet Robinson" (mattieschildl@yahoo.com) to the Medikos to place WIC orders for infant formula, listing milk formula WIC voucher codes as well as a name and physical address of the

---

[16]     The other two vouchers were unaccounted for at the time of the affidavit.  [Doc. 38-2 at 10].

40

WIC recipients.  For example, an e-mail dated May 3, 2013 with the subject line "WIC order for today 05/03/2013" from Robinson to the Medikos disclosed a name and the physical address of in Riverdale, Georgia, with an order for "7 cans EleCare (sic) Powder" and a list of "VC#'s."  McCree believed that the "VC#'s" listed in the e-mail message reflected WIC voucher numbers.  The Georgia WIC Information System disclosed a WIC recipient at the Riverdale, Georgia, address in the email, and the WIC Banking database disclosed that from December 3, 2012 through May 10, 2013, eleven WIC milk formula vouchers issued in the name of that recipient were deposited by Poly-Plex. These vouchers were signed by an individual whose first name was listed on the May 3, 2013 e-mail.  Another e-mail from Robinson to the Medikos dated February 15, 2013, had the handwritten word "PAID" with the name of the Riverdale, Georgia, WIC recipient as well as handwritten WIC voucher codes and numerical figures.  [*Id.* at 11].

Another document located during the search was titled "Independent Contractor Agreement" between Poly-Plex and Robinson, that provided that Robinson would receive a seven-percent commission for infant milk that is generated from client purchases.  McCree concluded from this document and the emails that Robinson was receiving financial compensation from Poly-Plex for directing WIC recipients to Poly-

41

Plex in order to sell their WIC vouchers for cash, and that Robinson and the Medikos were conducting at least a portion of these transactions via their yahoo.com email accounts. [*Id.* at 11-12].

The search warrant sought, among other things, the content of all emails associated with the accounts. [Doc. 38-1 at 3].[17] The warrant authorized the

---

[17]    Specifically, the warrant directed Yahoo! to produce to the Government the following information from the three email files:

A. The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

B. The contents of all instant messages associated with the account, including stored or preserved copies of instant messages sent to and from the account, the source and destination addresses associated with each instant message, the date and time at which each instant message;

C. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

D. The types of service utilized;

42

Government to seize all information that constituted fruits, evidence, and instrumentalities of violations of 42 U.S.C. § 1760 or conspiracy to commit such violations.  [*Id.* at 4].[18]

----

> E. All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

> F. All records relating to Yahoo! Instant Messenger services, including but not limited to: stored communications, transactional information, and contacts;

> G. All records pertaining to communications between Yahoo! Inc. and any person regarding the account, including contacts with support services and records of actions taken.

[Doc. 38-1 at 3-4]

[18]    The warrant authorized the Government to seize the following information from the files produced by Yahoo!:

> All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of 42 U.S.C. § 1760 (fraud in connection with food entitlement programs), and conspiracy to commit this offenses, including, for each account or identifier listed on Attachment A [the list of email accounts], information pertaining to the following matters:

> A. Records relating to any application, correspondence, rules, regulations, or other documentation concerning any United States Department of Agriculture Food Entitlement Program;

> B. Records relating to the purchase, redemption, sale, transfer, or

AO 72A
(Rev.8/8
2)

**B.    Defendants' Contentions**

Defendants[19] first contend that the warrant was overbroad in that the description of the items to be seized was broader than justified by the probable cause showing, since it authorized a search of the entirety of the email accounts, and such search is not made lawful merely by limiting the search by a conclusory reference to a broad set of federal statutes.  [Doc. 38 at 7-8 (citing *United States v. Galpin*, 720 F.3d 436, 445 n.5 (2d Cir. 2013); *United States v. Leary*, 846 F.2d 592, 594, 601 (10th Cir. 1988); *Voss*

———————————

distribution of vouchers for the Special Supplemental Nutrition Program for Women, Infants and Children (hereinafter WIC);

C. Records relating to the purchase, sale, transfer, or distribution of goods, products, or cash in connection with the WIC program;

D. Records relating to the transfer, financing, distribution, or concealment of illicit money laundering or its proceeds in connection with the purchase or redemption of WIC vouchers; and

E. Records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts.

[Doc. 38-1 at 4-5].

[19]    For purposes of this R&R, the Court assumes that all Defendants have standing to challenge the search warrant, although on its face there is no indication that Pauline has standing to challenge the search warrant as to Monica's or Fred's yahoo.com accounts, and none of the defendants would have standing to challenge a search of Robinson's yahoo.com account.

AO 72A
(Rev.8/8
2)

*v. Bergsgaard*, 774 F.2d 402, 405-06 (10th Cir. 1985); *United States v. Roche*, 614 F.2d 6, 8 (1st Cir. 1980))].  They also claim that an overbroad warrant cannot be cured by reference to the information set out in the affidavit.  [*Id.* at 8 (citing *Groh v. Ramirez*, 540 U.S. 551, 557 (2004))].  And, they contend, the affidavit and warrant are not in the least bit limited by reference to the " 'catch-all' " crimes of 42 U.S.C. § 1760[20] and conspiracy, since the seizure of an email account for evidence of WIC fraud could arguably encompass all information related to the accounts, and thus, an executing agent would not have any basis for eliminating any document related to the accounts, rendering the warrant facially overbroad and invalid.  [*Id.* at 8-9].  Defendants further argue that where the subject of the search is property that generally

_____

[20]     Title 42 U.S.C. § 1760(g) provides:

Whoever embezzles, willfully misapplies, steals, or obtains by fraud any funds, assets, or property that are the subject of a grant or other form of assistance under this chapter or the Child Nutrition Act of 1966, whether received directly or indirectly from the United States Department of Agriculture, or whoever receives, conceals, or retains such funds, assets, or property to personal use or gain, knowing such funds, assets, or property have been embezzled, willfully misapplied, stolen, or obtained by fraud shall, if such funds, assets, or property are of the value of $100 or more, be fined not more than $25,000 or imprisoned not more than five years, or both, or, if such funds, assets, or property are of a value of less than $100, shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

45

is used lawfully, greater care is required to protect against an invalid overly broad warrant.  [*Id.* at 9 (citing *United States v. Wey*, 256 F. Supp. 3d 355, 382 (S.D.N.Y. 2017); *Klitzman, Klitzman & Gallagher v. Krut*, 744 F2d 955, 960 (3d Cir. 1984))].

Defendants next argue that the warrant fails to set out what was sought to be seized and thus lacked the constitutional prerequisite of particularity.  [*Id.* at 10].  They point out that the warrant lacked a temporal limitation for the emails and electronically stored information ("ESI").  [*Id.* at 11-12 (citing *United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017); *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995); *United States v. Abrams*, 615 F.2d 541, 545 (1st Cir. 1980); *Wey*, 256 F. Supp. 3d at 367))].  They argue that the lack of particularity is particularly troublesome in the context of ESI, since the warrant failed to specify sufficiently the records to be identified and seized in terms of subject matter or temporal limitation.  They submit that the warrant's limitations as to the suggested categories of documents and information did not in reality limit the scope of the warrant's reach, and instead allowed the Government to seize nearly all of Poly-Plex's records and the Medikos' personal correspondence and documents in Yahoo!'s possession.  [*Id.* at 14].  Finally, they argue that the warrant did not establish a sufficient nexus between the email accounts and the federal crimes under investigation.  [*Id.* at 15-16].

46

### C.      Discussion

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and the persons or *things to be seized*."  (emphasis added).  "This requirement is aimed at preventing 'general, exploratory rummaging in a person's belongings.' " *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)); *see also Blake*, 868 F.3d at 973.  A warrant which fails to sufficiently particularize the place to be searched or the things to be seized is unconstitutionally over broad and the resulting general search is unconstitutional.  *Massachusetts v. Sheppard*, 468 U.S. 981, 988 n.5 (1984);  *Stanford v. Texas,* 379 U.S. 476, 512 (1965).   In order to deter such warrants and searches, any evidence so seized must be excluded from the trial of the defendant. *Stone v. Powell,* 428 U.S. 465, 486 (1976); *United States v. Travers*,  233 F.3d 1327, 1329 (11th Cir. 2000).

A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things to be seized.  *United States v. Santarelli*, 778 F.2d 609, 614 (11th Cir. 1985); *Wuagneux*, 683 F.2d at 1349; *United States v. Cook*, 657 F.2d 730, 733 (5th Cir. Unit A 1981).  A search warrant must indeed be sufficiently precise as not

AO 72A
(Rev.8/8
2)

to permit a general search, but the test is the reasonableness of the description. Elaborate specificity is unnecessary. *See United States v. Strauss*, 678 F.2d 886, 892 (11th Cir. 1982); *Osborne*, 630 F.2d at 378. Instead, the test is whether the search was a general exploration or specifically directed to the means and instrumentalities by which the crime charged had been committed. *Harris v. United States*, 331 U.S. 145, 153-54 (1947).

The Court rejects Defendants' arguments for several reasons. Most importantly, the Supreme Court has established a "good faith" exception to the exclusionary rule to prevent suppression of the items found pursuant to a search warrant. Under *United States v. Leon*, 468 U.S. 897, 913 (1984), the "good faith" exception to the rule requiring the suppression of evidence for violations of the Fourth Amendment keeps evidence from being suppressed when law enforcement officers obtain evidence through objective good faith reliance on a facially valid warrant that is later found to lack probable cause. *See United States v. Gonzalez*,  969 F.2d 999, 1004 n.4 (11th Cir. 1992). The Eleventh Circuit Court of Appeals has held that the good faith exception to the exclusionary rule applies to alleged violations of the particularity requirement. *See United States v. Accardo*, 749 F.2d 1477, 1479-81 (11th Cir. 1985). Further, the Eleventh Circuit, citing *Accardo*, affirmed that the good faith exception may be applied

48

AO 72A
(Rev.8/8
2)

to an overly broad warrant. *Travers*, 233 F.3d at 1330 (citing *Accardo*, 749 F.2d at 1481).

Nevertheless, "it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Leon*, 468 U.S. at 922-23. *Leon*'s good faith exception does not apply to the following situations: (1) where the magistrate judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate judge wholly abandoned her or his judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient – *i.e.*, in failing to particularize the place to be searched or the things to be seized–that the executing officers cannot reasonably presume it to be valid. *United States v. Robinson*, 336 F.3d 1293, 1296 (11th Cir. 2003). Thus, under *Leon*'s third exception, the affidavit must not be a "bare-bones" statement containing nothing more than conclusory allegations. *See Leon*, 468 U.S. at 915; *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998).

Defendants do not address either the good-faith exception or argue that the

AO 72A
(Rev.8/8
2)

warrant was so lacking in indicia of probable cause as to render official reliance on it unreasonable.  In any event, the Court finds that the affidavit was not so lacking in probable cause as to render official belief in its existence entirely unreasonable. *Robinson*, 336 F.3d at 1296.  The application more than adequately set forth facts tending to demonstrate Poly-Plex was engaged in unlawful redemption of WIC vouchers, that Monica and Fred were involved in this scheme, and that a sufficient nexus existed between the crimes under investigation and their Yahoo! email accounts, since the evidence presented in the warrant application showed that the email accounts were being used to facilitate and conduct the illegal activity.

Defendants fare no better as to *Leon*'s fourth exception.  First, in *Blake*, the FBI applied for and obtained search warrants for the defendant Facebook account that, similar to the case here, required Facebook to disclose virtually every type of data associated with the defendant's account, and then after that disclosure, authorized the Government to seize information that constituted fruits, evidence, and instrumentalities of a specified crime from that cache of data.  *Blake*, 868 F.3d at 966-67.  The Eleventh Circuit expressed its concern that this two-stage procedure violated the particularity clause and essentially amounted to "the internet-era version of a 'general warrant.' " *Id.* at 974.

50

Despite *Blake*, the Eleventh Circuit has reiterated that the particularity requirement requires a "practical margin of flexibility." *United States v. Alford*, 744 Fed. Appx. 650, 653 (11th Cir. Aug. 3, 2018*)* ("using a practical margin of flexibility, the warrant here was as specific as the circumstances and nature of the activity under investigation permitted") (citing *United States v. Bradley*, 644 F.3d 1213, 1259 (11th Cir. 2011) (explaining the particularity requirement must be applied with a practical margin of flexibility); *United States v. Moody*, 977 F.2d 1425, 1432 (11th Cir. 1992) (stating a description of the property to be seized will be acceptable if it is as specific as the circumstances and nature of the activity under investigation permit)). *Alford* noted that n *Blake*, the court concluded that a warrant requiring Microsoft to turn over all emails containing potentially incriminating evidence was constitutional because that limitation prevented a general rummaging through the defendant's emails. *Blake*, 868 F.3d at 973. However, the court concluded that warrants requiring Facebook to disclose "virtually every kind of data that could be found in a social media account" were unconstitutional because, for example, the warrants could have limited the search of private messages to only those sent or received from persons suspected of being involved with the offense. *Id.* at 974. The court also noted that the warrants should have only requested data from the period of

51

time during which the defendant was suspected of taking part in a conspiracy. *Id.* Nonetheless, the *Blake* court ultimately concluded, however, that although the Facebook warrants violated the particularity requirement, they were not so facially deficient the officers could not have reasonably believed them to be valid. *Id.* at 975. Specifically, the court found (1) that the warrants were supported by probable cause and (2) that whether or not they violated the particularity requirement was "not an open and shut matter." *Id.* ("[I]t is a close enough question that the warrants were not so 'facially deficient' that the FBI agents who executed them could not have reasonably believed them to be valid.").

Here, the same result obtains. The *Blake* opinion said it was helpful that the warrants limited the data seized to the data relevant to the specified crime. *Blake*, 868 F.3d at 967. In the present case, although there was no temporal limitation and the warrant authorized the Government to obtain all records from the email accounts, the warrant limited the Government to seizing records that evidenced the crimes under investigation. It also is significant in the Court's view that the evidence submitted to the issuing Magistrate Judge showed that (1) Poly-Plex's redemption and deposit of WIC vouchers was so extensive given its limited foodstuff inventory, small-store classification, and comparison to large-scale retailers such as Kroger and Walmart,

52

going back to 2009; and (2) the Medikos were using their Yahoo! email accounts, not a corporate or business account, to facilitate the scheme.  These facts reasonably allowed the issuing judge to conclude that the Medikos were engaged in pervasive, long-term fraudulent business activity using their personal email accounts, such that it would have been difficult, beyond perhaps some temporal limitations, to impose restrictions on what the agents could review in these accounts.  Thus, to the extent that the warrant was overbroad and lacked particularity, the *Leon* good-faith exception saves the warrant's fruits from suppression.

Aside from *Leon*, the Court also notes that the warrant authorized the seizure of evidence relating to who used the account.  [Doc. 31 at 5].  In the present case, attribution and use of a specific email account was evidence useful to law enforcement in determining whether the nominal owner of an email account involved in criminal activity is responsible for the alleged crimes facilitated by the email account, or whether other persons with access to the account have used the account to facilitate the offenses under investigation.  *Cf. Alford*, 744 Fed. Appx. at 653 (holding that warrant did not violate *Blake*'s proscriptions because "[a]lthough the warrant requested nearly every kind of data that could be found in a Google account, any of that data could have helped identify the owner of the account. [The FBI] was not merely rummaging around

53

*Alford*'s Google account to find whatever he could, but rather was trying to find the identity of the caller and potential victim."). Thus, under the facts of this case, the warrant was as limited as possible (aside from temporal uncertainty) because all of the evidence seized could help identify the owner and user of the accounts.

Furthermore, Defendants have not demonstrated that the execution of the warrant was unconstitutional, as is their burden. *Franks*, 438 U.S. at 171; *Van Horn*, 789 F.2d at 1500. For example, they have not demonstrated that the warrant's execution swept up non-evidentiary data or was temporarily excessive, given the long-running time period of the alleged scheme.

Moreover, the warrant at issue was executed over four years before *Blake* was decided. *See United States v. Panky*, No. 417CR00023HLMWEJ, 2017 WL 9478491, at *2 (N.D. Ga. Nov. 28, 2017), report and recommendation adopted, No. 417CR02301HLMWEJ, 2017 WL 6372242 (N.D. Ga. Dec. 13, 2017) (where warrant was issued about three months before *Blake*, "[t]his timing issue means that there was nothing in way of recent case law to alert authorities to the fact that this warrant may have been questionable. The authorities in this case were essentially in the same position as those in *Blake*.")

Accordingly, for all of the reasons stated above, the undersigned

54

**RECOMMENDS** that Defendants' motion to suppress emails, [Doc. 38], be **DENIED**.

### IV.    *Motion to Sever, [Doc. 31]*

Defendant filed a motion to sever on the grounds of spillover and the fact that they are part of the same family, as well as a result of *Bruton v. United States*, 391 U.S. 123 (1968).

Rule 14(a) of the Federal Rules of Criminal Procedure allows for severance if joinder "appears to prejudice a defendant or the government." FED. R. CRIM. P. 14(a). However, "there is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *see also United States v. Alvarez*, 755 F.2d 830, 857 (11th Cir. 1985) ("The general rule in [the Eleventh Circuit] is that defendants who are jointly indicted should be tried together, and this rule has been held to be particularly applicable to conspiracy cases."). Rule 14(a) requires "a [district] court to balance the rights of the defendant[ ] and the government to a trial that is free from the prejudice" against the public interest in judicial economy. *United States v. Novaton*, 271 F.3d 968, 989 (11th Cir. 2001) (quotation omitted) (reviewing the denial of a codefendant severance motion).

A severance under Rule 14 of the Federal Rules of Criminal Procedure should be granted only if the defendant can demonstrate that a joint trial would result in

AO 72A
(Rev.8/8
2)

specific and compelling prejudice to the conduct of his defense. *United States v. Marszalkowski*, 669 F.2d 655 (11th Cir. 1982). The test for compelling prejudice is "whether under all the circumstances of a particular case, as a practical matter, it is within the capacity of the jury to follow the [instructions] and accordingly . . . appraise the independent evidence against each defendant's own acts, statements and conduct." *United States v. Kabbaby*, 672 F.2d 857 (11th Cir. 1982). Conclusory allegations do not satisfy the defendant's burden, since courts presume that jurors can compartmentalize evidence by respecting limiting instructions specifying what evidence may be considered against what defendant. *United States v. Blankenship*, 382 F.3d 1110, 1123 (11th Cir. 2004) (citing *United States v. Schlei*, 122 F.3d 944, 984 (11th Cir. 1997)); *see also United States v. Duzac*, 622 F.2d 911, 912 (5th Cir. 1980) (in affirming denial of severance motion asserting grounds that codefendant might testify for defendant, holding that severance not necessary upon defendant's "generalized vague and speculative assertions").

In satisfying this burden, it is not enough for a defendant to show that acquittal would be more likely if she was tried separately, since some degree of bias is inherent in a joint trial. *Alvarez*, 755 F.2d at 857 (citing *United States v. Walker*, 720 F.2d 1527, 1533 (11th Cir. 1983), and *Marszalkowski*, 669 F.2d at 660). Furthermore, a defendant

56

does not suffer "compelling prejudice" simply because much of the evidence at trial is applicable only to her codefendants. *Id.* (citing *United States v. Zielie*, 734 F.2d 1447, 1464 (11th Cir. 1984), and *United States v. Berkowitz*, 662 F.2d 1127, 1135 n.8 (5th Cir. Unit B 1981)); *see also United States v. Cassano*, 132 F.3d 646, 651 (11th Cir. 1998) (same). Also, evidence of the reputation or past crimes of a codefendant does not ordinarily justify severance. *See United States v. Howell*, 664 F.2d 101, 106 (5th Cir. 1981); *United States v. Ocanas*, 628 F.2d 353, 359 (5th Cir. 1980); *United States v. Perez*, 489 F.2d 51, 67 (5th Cir. 1973), and cases cited therein.

Even if a defendant can show some prejudice, a defendant is entitled to severance only if that "prejudice flowing from a joint trial is clearly beyond the curative powers of precautionary instruction." *United States v. Morrow*, 537 F.2d 120, 126 (5th Cir. 1976); *Puiatti v. McNeil*, 626 F.3d 1283, 1310 (11th Cir. 2010) (recognizing that defendant seeking severance has a "heavy burden" of demonstrating compelling prejudice which occurs only where there is a serious risk that a joint trial (1) "would compromise a specific trial right of one of the defendants," or (2) would "prevent the jury from making a reliable judgment about guilt or innocence.") (citations omitted); *see also United States v. Walser*, 3 F.3d 380, 385 (11th Cir. 1993) (recognizing that a

AO 72A
(Rev.8/8
2)

court errs in denying a severance motion if the denial "result[ed] in compelling prejudice against which [it] could offer no protection").

Finally, whether to grant a motion to sever involves an exercise of the court's considered discretion. *United States v. Jacoby*, 955 F.2d 1527, 1542 (11th Cir. 1992).

First, Defendants' motion is due to be denied on the grounds of prejudicial spillover of evidence and the fact that they are related. They did not show in their motion how they are prejudiced by spillover, and they have not pointed the Court to any precedent–and the Court has located none–that holds that severance was warranted because the defendants were related. Further, as to their citation to *United States v. Cobb*, 185 F.3d 1193 (11th Cir. 1999), [*see* Doc. 31 at 1], the Eleventh Circuit reversed the defendant's conviction because the district judge there erred in not severing that defendant's case in order to obtain exculpatory testimony from a codefendant. Defendants have made no such showing in their motion.

Second, Defendants also seek severance under *Bruton*. In *Bruton*, the Supreme Court held that post-arrest statements made by non-testifying co-defendants that facially incriminate other defendants are inadmissible into evidence because such statements violate the other defendants' Sixth Amendment rights to confront and cross-examine adverse witnesses. The Supreme Court concluded that "where the

58

powerfully incriminating extra-judicial statements of a co-defendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," limiting instructions by the court will not suffice to eliminate the prejudicial effect of the introduction of such statements. *Bruton*, 391 U.S. at 135-36. In this case, Monica made statements that in part implicated Fred and Pauline.

The Court is not aware of what portions of Monica's statement the Government intends to introduce at trial, and whether it intends to not introduce any portion of Monica's statements that might implicate Fred and Monica. Accordingly, this portion of the motion for severance is **DEFERRED** to the District Judge.

## V.    *Conclusion*

For all of the above and foregoing reasons, the undersigned **RECOMMENDS** that the motion to suppress statements, [Doc. 32], motion to suppress evidence, [Doc. 34], and motion to suppress emails, [Doc. 38], be **DENIED**. The motion for severance as to overspill and prejudice, [Doc. 31], is **DENIED**, as to *Bruton*, [Doc. 31] is **DEFERRED** to the District Judge to be considered at the time of trial.

The Court has now recommended a ruling on all matters referred, and has not been advised of any further impediments to the scheduling of a trial. Therefore, this matter is **CERTIFIED READY FOR TRIAL**.

AO 72A
(Rev.8/8
2)

**IT IS SO RECOMMENDED, ORDERED, AND CERTIFIED**, this the 31st day of December, 2018.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

60